**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-184 (BAH)** |
| **v.** | : | |
| | : | |
| **JAMES ALLEN MELS,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant James Allen Mels to 30 days of imprisonment, one year of supervised release, 60 hours of community service, a $25 special assessment, and $500 in restitution.

### I.      Introduction

Defendant James Allen Mels, a 57-year-old resident of Shelby Township, Michigan, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.7 million in losses.

Defendant Mels pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1).  As explained herein, a sentence of 30 days of imprisonment is appropriate in this case because (1) in the days and weeks leading up to January 6, Mels sent out text messages glorifying political violence and foretelling "hangings," "execution[s]," and "gitmo," among other incendiary statements, in connection with January 6; (2) on January 6, as he prepared to enter the Capitol building, Mels stood immediately outside the Senate Wing Door for several minutes, as United

1

States Capitol Police officers were struggling to contain the rioters a few feet in front of him; (3) despite the mayhem around him, Mels entered the Capitol building less than one minute after other rioters violently overran a line of Capitol Police officers; (4) once inside the Capitol building, Mels harangued a Capitol Police lieutenant, waving a booklet close to the officer's face and diverting the officer's attention as the Capitol breach was unfolding; and (5) after spending approximately 10 minutes in the Senate Wing Door area, Mels continued deeper into the Capitol building, marching through the Crypt, by the Memorial Door, and through the Hall of Columns, before exiting the building through the South Door.

The Court must also consider that Mels' conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, No. 1:21-cr-133 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution.  And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country.  I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates).  Mels' actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, No. 1:21-cr-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers.  The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Here, the facts and circumstances of Mels' crime demonstrate that a sentence that does not include a term of imprisonment would be insufficient to

reflect the seriousness of Mels' conduct on January 6; a sentence of 30 days' imprisonment is both necessary and appropriate.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary repetition, the government refers to the general summary of the attack on the U.S. Capitol in the Statement of the Offense submitted in connection with Mels' guilty plea.  *See* ECF No. 71 (Statement of Offense), at ¶¶ 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions, from the most mundane to the most violent, contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop, we turn to Mels' conduct leading up to and on January 6.

### *Defendant Mels' Role in the January 6, 2021 Attack on the Capitol*

By the fall of 2020, Mels had become a follower of "The Patriot Hour," a podcast livestreamed on various internet platforms that propagated conspiracy theories about the 2020 presidential election and other topics.  In December 2020, Mels received an invitation to join the show's hosts on a trip to Washington, D.C. on January 6.  Mels accepted the invitation.  In the following days and weeks, Mels sent numerous text messages to share his excitement about the upcoming trip.  *See* Ex. 1 (12/22/20 texts: "am going to Washington DC January 6th … With Michael from the patriot hour and woodman his sidekick.  Im so excited[.]"); Ex. 2 (12/25/21 group text to 20 recipients: "I am going to DC January 6th woo hoo"); Ex. 3 (12/30/20 text: "Im goin to DC woo hoo[.]"); Ex. 4 (1/1/21 text: "I'm getting excited for DC"); Ex. 5 (1/1/21 text: "Im so excited to go and witness this."); Ex. 6 (1/3/21 text: "Im getting excited about DC its going to be wild.  The peace and freedom Im feeling is so awesome.  So proud of myself[.]  … Im going to support the last stand for God Jesus Christ and the Holy spirit.  I and 1.5 million people.  We are

taking back America from the evil that's trying to over take it."); Ex. 7 (1/3/21 text: "I'm so excited.  Spread the word the world is watching").

In addition to sharing his excitement, Mels' text messages make clear that he anticipated that the January 6 events would turn violent.  A few examples illustrate the point:

- On December 22, 2020, Mels texted one of his contacts ("Wolf Silver"): "Yep and the best us patriots can do is cut your heads off for treason?  What do you think about that congress?"  Later that day, Mels invited "Wolf Silver" to join him on the trip to Washington, D.C.: "So we're wondering if it's possible you can go to Washington DC a January 6[.]"  Ex. 8.

- On December 30, 2020, Mels, who goes by the nickname "Jimmy," texted another contact ("Ramona"): "Im bringing my 30 30 Winchester.  My dad calls me one shot Jimmy with that thing."[1]  Ex. 9.

- The following day, in response to a text message by "Woodman"[2] that "Things will be ok," Mels wrote: "Ohhhh I know that God is with us … Im just prepared to meet Him."  Ex. 10.  Later on December 31, Mels also told Woodman: "Please don't say Jimmy Mels too much[.] …. You put me on a pedestal and its unconformable.  Im just a regular guy like you.  Wanting to help people like minded to save this country from forgein [sic] and domestic terrorist.  Tradors [sic] treasonous rat bastards sold out my taxpaying county [sic]."  Ex. 11.

---

[1]    Mr. Mels later told the FBI that he did not bring any weapons with him on January 6, and the government is not aware of any other evidence suggesting that he did.

[2]    "Woodman" appears to be the individual who co-hosted the The Patriot Hour with "Michael."  Ex. 1.

- On January 1, 2021, in response to another contact's question "What??? DC what are you going there for???", Mels texted: "Hangings?  Execution?  Gitmo?  We the people are getting our country back from these treasonous rat bastards[.]   Corruption at the highest level."  Ex. 12.

- On the same day, Mels also texted his contact "Olivia":  "These are the patriots Im going with. … Truth tellers.  This guy is the Guru proof fraud was made[.]  That's treason and if the people involved were government officials?  Treason is punishable by death.  We the people want the death penalty.  For crimes against humanity."  Ex. 13.  Mels texted a contact listed on his phone as "Mike Top Fuel": "Mass arrests on the 5th (D5) my perdition [sic] treason in the highest order.  It has to be this way.  Gitmo for the lucky ones.  We the people have to eradicate evil."  Ex. 14.  And he texted a contact listed as "Brother Janets": "Im going to DC in 4 daze.  Once a veteran always a veteran.  Defending this country from terrorists foreign or domestic.  Till death do US part.  Wwg1wga."  Ex. 15.

- On January 2, 2021, Mels sent a text message to his contact "Roese Rich": "Balls my friend balls.  Im going to DC in 3 daze."  Minutes later, Mels added: "More balls. … And We the People are going to hang them by their [b]alls?"  Ex. 16.

- On the same day, Mels sent the following text messages to another contact ("Randy"), again confirming his willingness to die for his cause: "Just saying be [] careful[] of what you hear watch and listen to.  Fake news is real.  Thepatriothour.tv[.]  One of the best out there.  But there are a lot of truth tellers.  (Peacemakers) as the bible speaks of.  Peacemakers are the sons of God.  That where I stand tall.  And will die for it.  My county [sic].  My freedom.  My rights in the Constitution of the United States of

America.  Once a patriot always a patriot.  Im not selling out to any other country.  Period.  I ride in the USA I support my President Trump."  Ex. 17.  Minutes later, Mels added: "If I don't come back ?  …  I am in stable mind and I am Not suicidal.  I am a Christian and I believe the Holy Spirit is telling me to write this to you now.  So please honor this letter."  *Id.*

On January 4 and 5, 2021, Mels and "Wolf Silver" drove from Michigan to Elkhart, Indiana to pick up more people and, from there, to Washington, D.C., where the group spent the night at an Airbnb in the Shaw neighborhood.

On the morning of January 6, Mels attended the "Stop the Steal" rally at the Ellipse, at which former President Trump spoke.  Mels wore blue jeans, a mostly black-and-white jacket with "USA" printed on the sleeves and an American flag printed on the back, an olive hat, sunglasses, and a backpack.  From the Ellipse, Mels marched with others to the Capitol.  At some point, Mels separated from the rest of his group.  By 2:17 p.m., Mels had entered the Capitol's restricted grounds and reached the steps outside the northwest side of the Capitol building:



Ex. 18.  Mels then went up the stairs of the Capitol, approaching the Senate Wing Door on the

west side of the Capitol building.  By 2:36 p.m., Mels stood immediately outside the Senate

Wing Door, in between a smashed-in window and a door whose glass inset had been shattered:





Ex. 19 (still images at 4:59 and 6:17, respectively).  Immediately behind Mels, rioters repeatedly

climbed on a window ledge to address the Capitol Police officers who were protecting the building

inside.  *Id.*  Immediately in front of Mels, more rioters were preparing to forcibly breach the Senate

Wing Door.  *Id.*  All around, the crowd in that area could be heard screaming, among other things,

"Hold the line!", "Fight for Trump!", "Let us in!", "Our House!", and "I'm coming for you, Nancy!"

At approximately 2:47 p.m., the mob of rioters immediately ahead of Mels began forcing its way through the Senate Wing Door.  More than a dozen officers, most of them in riot gear, attempted to turn back the attack.  As the rioters and the police were facing off, one of the rioters used a flag pole to beat down on the officers' heads, all within feet of Mels:





Ex. 20 (still images between 2:47:22 p.m. and 2:48:43 p.m.).  Less than two minutes later, a mob far outnumbering the officers overran the police line and seized control of the foyer inside the Senate Wing Door.

Within a minute, Mels, who had been standing immediately outside the Senate Wing Door, entered the Capitol Building through the same door:



*Id.* at 2:49:20 p.m.  Once inside, Mels walked toward a group of Capitol Police officers, coming

within less than two feet of the officers.  He then approached a Capitol Police lieutenant, who

wore a distinctive peaked hat, and waved what appears to be a booklet or document close to the

lieutenant's face:





*Id.* at 2:50:00 p.m., 2:50:26 p.m.; *see also* Ex. 21.  The conduct of Mels and other rioters around him made the lieutenant's task of leading other officers as the breach unfolded even more daunting.

After spending approximately 10 minutes in the Senate Wing Door lobby, Mels walked deeper into the Capitol building, marching through the Crypt, by the Memorial Door, and through the Hall of Columns:







Ex. 22 at 3:00:14 p.m. (Crypt); Ex. 23 at 3:01:27 p.m. (House Door); Ex. 24 at 3:02:06 p.m. and

3:02:40 p.m. (Hall of Columns).  Mels exited the Capitol building through the South Door at

around 3:02 p.m.:



Ex. 25 (at 3:02:44 p.m.) (South Door).   Later that evening, Mels rejoined with his travel companions.  The group drove back to Michigan the following day.

*Mels' Interview with the FBI*

On January 25, 2021, Mels agreed to give a voluntary, non-custodial interview to the FBI in a parking area outside Mels' home.  At the outset of the interview, Mels acknowledged that he had entered the Capitol building on January 6, 2021.  Mels also acknowledged that, at the Capitol, he was exposed to "gas" as it blew over the crowd.  Mels denied traveling with any weapons or pepper spray and explained that he went to Washington, D.C. on January 6 because he believed that the election had been fraudulent.  Mels also told the FBI that he suspected that "Soros" or "Black Lives Matter" supporters incited the violence on January 6.  During his FBI interview, Mels claimed that he walked into the Capitol through an open door with many other people.  He also claimed that he did not realize that his conduct was illegal because no one told him to stop.

In fact, Mels had stood only feet away from the rioters who violently overran a police line to breach the Senate Wing Door at 2:47 p.m.

Mels further stated that, after progressing about 20 feet into the Capitol building, he encountered a police officer whom he thought was a "Captain or Chief," based on the fact that he wore a peaked hat.  According to Mels, he stopped in front of the officer, held up a copy of the United States Constitution, and said, "I'm not here to hurt you.  Jesus wanted me to come here."  Mels claimed that, once he delivered his message to the officer, he saw a United States flag against the backdrop of sunlight shining through an exit door.  Mels claimed that he followed the flag into the light of the exit.  In fact, Capitol surveillance video shows that Mels marched through the Crypt and Hall of Columns before exiting the Capitol on the south side of the building.

Pursuant to his plea agreement, Mels also agreed to a second interview, which took place in August 2022.  During that interview, Mels provided additional details about his participation in the January 6 riot.  It appears that, at the August 2022 interview, Mels was truthful.

*The Charges and Plea Agreement*

On February 10, 2021, the United States charged Mels by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5401(e)(2)(D) and (G).  On February 11, 2021, law enforcement officers arrested him at his home in Shelby Township, Michigan.  On March 3, 2021, Mels was charged by information with entering and remaining in a restricted building, in violation of 18 U.S.C. § 1752(a)(1) (Count One); disorderly and disruptive conduct in a restricted building, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); violent entry and disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5401(e)(2)(D) (Count Three); and parading, demonstrating, and picketing in a Capitol Building, in violation of 40 U.S.C. § 5401(e)(2)(G) (Count Four).  The United States filed an amended information asserting the same charges on July

1, 2022.  On July 22, 2022, ten days before the scheduled trial date, Mels pleaded guilty pursuant to a plea agreement to Count One of the Information, which charges him with entering and remaining in a restricted building.  Under the plea agreement, Mels agreed to pay $500 in restitution to the Architect of the Capitol.

### III.  Statutory Penalties

Mels now faces sentencing on a single count of violating 18 U.S.C. § 1752(a)(1).  As noted in the plea agreement and by the U.S. Probation Office, Mels faces up to one year of imprisonment and a fine of up to $100,000.  Mels must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-1079 (D.C. Cir. 2008).

### IV.  The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.  *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.  *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the Presentence Investigation Report ("PSR").  According to the PSR, the U.S. Probation Office calculated Mels' adjusted offense level under the Sentencing Guidelines as follows:

Base Offense Level (U.S.S.G. § 2B2.3(a))                           +4

Specific Offense Characteristics (U.S.S.G. § 2B2.3(b)(1)(A))[3]    +2
Acceptance of Responsibility (USSG §3E1.1(a))                     -2
**Total Adjusted Offense Level**                                 **4**

*See* PSR ¶¶ 29-36.

The U.S. Probation Office calculated Mels' criminal history as a category I.  PSR ¶ 39. Accordingly, the U.S. Probation Office calculated Mels' total adjusted offense level, after acceptance of responsibility, at 4, and his corresponding Guidelines imprisonment range at 0 to 6 months of imprisonment. PSR ¶ 71.  Mels' plea agreement includes an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.  Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.  As the Third Circuit has stressed:

---

[3]     The PSR applies this offense characteristic under U.S.S.G. § 2B2.3(b)(1)(A) because the trespass occurred "at a restricted government facility."  PSR ¶ 31.  To be clear, as indicated in the defendant's plea agreement, this offense characteristic applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. § 2B2.3(b)(1)(A)(vii).  ECF No. 70 at 3. Specifically, on January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B).

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that are being subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

Sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days of imprisonment.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots.  It represented a grave threat to our democratic norms and practices.  Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances.  As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air, as Mels did this in this case.  No rioter was a mere tourist that day.

Additionally, while assessing Mels' individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1)

whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person, text messages, and social media; (8) whether the defendant cooperated with, or ignored, commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Mels personally engaged in violence or destruction, he would be facing additional charges and penalties associated with that conduct. The absence of violent or destructive acts on the part of Mels is therefore not a mitigating factor in misdemeanor cases.

Even before traveling to Washington, D.C., Mels anticipated that the purported "protest" set to take place on January 6 would likely involve political violence. In text message after text message, Mels described the purpose of his trip and the events he expected to witness in Washington, D.C. in nearly apocalyptic terms. In two illustrative examples, Mels predicted "hangings," "execution" of "treasonous rat bastards," and stated that "treason is punishable by death" and "We the people want the death penalty." *Supra* p. 5.

Mels' eagerness to join what he anticipated to be a violent political event is troubling. In the days leading up to his trip, Mels reached out to more than two dozens contacts to tell them that, "woo hoo," he was "so excited" to be headed to Washington, D.C. for January 6. *See supra* pp. 4-5 (citing text messages). Especially as an Army veteran, Mels presumably would have understood the significance of glorifying the prospect of civil unrest and political violence on the

streets of the Nation's capital.  Nonetheless, in sending his violent texts, Mels embraced the use of violence against the government.

The scene Mels encountered as he prepared to enter the Capitol building on January 6 left no doubt that he was joining a violent riot, not a peaceful protest.  By the time Mels reached the steps outside the northwest side of the Capitol building, Mels had already been exposed to "gas" as it blew over the crowd.  Still, Mels continued to make his way up the stairs of the Capitol.  By about 2:36 p.m., Mels stood in the midst of a large mob immediately outside the Senate Wing Door, in between a smashed-in window and a door whose glass inset had been shattered.  *See supra* p. 8; Ex. 19 (4:58 to 6:50).  All around, at approximately the same time, the crowd could be heard screaming ominous slogans, including "Hold the line!", "Fight for Trump!", "Let us in!", "Our House!", and "I'm coming for you, Nancy!"  Then, at approximately 2:47 p.m., a violent confrontation for control of the Senate Wing Door unfolded right in front of Mels, as rioters overran a police line and breached the Senate Wing Door for the second time that day.

The violence did not deter Mels.  To the contrary, less than one minute after the mob overran the police line, Mels, who had been standing only feet away, entered the Capitol building through the same door.  Nor did Mels limit himself to casually looking around the Senate Wing Door lobby.  Once inside, Mels marched right up to a group of Capitol Police officers, picked out the officer he identified (correctly) as the leader of the group, and ranted at him, coming within less than two feet of the officers and waving what appears to be a booklet or document close to the lieutenant's face.  As the video evidence shows, Mels's actions did not just add fuel to a violent riot, which would itself constitute egregious conduct.  His actions, especially combined with the actions of other rioters at the scene, also diverted the Capitol Police officers' attention as the riot was unfolding around them.

Nor was Mels content with interfering with the officers.  As noted, after ranting at the officers, Mels made his way deeper into the building, ultimately marching through the Crypt, by the House Door, and through the Hall of Columns, before exiting through the South Door.

### B.  Mels' History and Characteristics

As set forth in the PSR, Mels' criminal history consists of a 1993 federal bank fraud conviction, for which he received a sentence of 36 months' probation.  PSR ¶ 38.  Mels enlisted in the U.S. Army in 1983 and was honorably discharged in 1986.  While enlisted, Mels became a hand grenade and M-16 rifle expert.  PSR ¶ 60.  Since approximately 2012, Mels has worked as a metal model maker, fixture builder, and journeymen toolmaker.  PSR ¶ 62.  He is currently employed at a factory in Roseville, Michigan.  *Id.*  Since he was charged in March 2021, Mels has been generally compliant with his conditions of pre-trial release, though he failed to check in with the probation office on three occasions.  PSR ¶ 11.

While Mels' military service is laudable, it renders his conduct on January 6 all the more troubling.  As a former military member with training in combat weapons, Mels had every reason to understand the dangers posed by the violence and rioting that were unfolding before his eyes.  He also presumably understood the risks inherent in having a mob of possibly armed rioters overrun a line of police officers and roam the halls of Congress.  Mels' military service and training therefore make his decision to storm a guarded government building especially troubling.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[4]  As with the nature and circumstances of the offense, this factor supports a substantial deprivation of the defendant's liberty, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *Cf. United States v. Joshua Bustle and Jessica Bustle*, No. 1:21-cr-238 (TFH), Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of a prison sentence in this case, as it does in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of actual incarceration in most January 6 cases. "Future would-be rioters must be deterred."  *United States v. Thomas Gallagher*, No. 1:21-cr-41 (CJN) Tr. 10/13/2021 at 37 (statement of Judge Nichols at sentencing).

General deterrence is an important consideration because many of the rioters, including Mels, intended that their actions on January 6 would disrupt, if not prevent, one of the most

---

[4]      Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, No. 1:21-cr-18 (RDM):

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.  The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was [before January 6, 2021] for the United States and our diplomats to convince other nations to pursue democracy.  It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  As this Court and other judges in this district have observed, this was not a protest.  *See United States v. Anthony Vuksanaj*, No. 1:21-cr-620 (BAH), Tr. at 34 ("It just has been confusing to people who think that what happened on January 6th was a protest or just a demonstration in the wrong place, inside the Capitol Building; and that is not what happened on January 6th.  It was not a protest.  It was a riot, it was an attack on our rule of law.  It was a successful effort to disrupt our democratic process."); *United States v. Paul Hodgkins*, No. 1:21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Specific deterrence also weighs in favor of a sentence that includes a substantial deprivation of liberty, such as the 30 days of imprisonment recommended by the government.  To be sure, Mels' criminal history is limited; it appears that Mels was truthful at his post-plea debriefing (though not so at his initial FBI interview); and he has purported to express remorse for his conduct on January 6.  At the same time, Mels' participation in the January 6 attack was evidently the result of his apocalyptic, conspiratorial view of the political process—an outlook that Mels has not persuasively shown he has abandoned.  A meaningful deprivation of liberty, such as 30 days of imprisonment, will hopefully underscore for Mels the critical distinction between political advocacy and violent rioting, and the criminal nature of his conduct in this case.

**E.  The Need to Avoid Unwarranted Sentencing Disparities**

As this Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging  from unlawful entry misdemeanors,  such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5]  This Court must sentence Mels based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. Although those like Mels convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor

---

[5]      Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

crimes.  A probationary sentence should not be the default.[6]  *See United States v. Anna Morgan-Lloyd,* 1:21-cr-164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing).  Accord, *United States v. Valerie Ehrkle,* 1:21-cr-97 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Mels has pled guilty to Count One of the Amended Information, which charges him with entering and remaining in a restricted building, in violation of 18 U.S.C. § 1752(a)(1).  This offense is a Class A misdemeanor.  18 U.S.C. § 3559.  The sentencing factors in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), apply.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill,* 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

---

[6]     Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd,* 1:21-cr-164 (RCL); *United States v. Valerie Elaine Ehrke,* 1:21-cr-00097 (PFF); and *United States v. Donna Sue Bissy,* 1:21-cr-00165 (TSC).  The government is abiding by its agreement in those cases, but has made no such agreement in this case.  *Cf. United States v. Rosales-Gonzales,* 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not, given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

In cases, like this one, for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-1344 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses are an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. This Court may, for reference, consider the sentence it imposed in *United States v. Carson S. Lucard*, No. 1:22-cr-87 (BAH). Similarly to Mels, Lucard entered the Capitol building through the Senate Wing Door shortly after a police line protecting the door and windows was violently broken by rioters and the area was breached for a second time—Lucard three minutes after that second breach and Mels less than one minute. Similarly to Mels, Lucard remained in the Senate Wing Door lobby for several minutes, during which time he shouted at Capitol Police officers who were guarding the area, distracting them from

their duties.  Similarly to Mels, Lucard also spent additional time reaching deeper into the Capitol building.  Finally, just as Mels downplayed aspects of his conduct in his initial interview with the FBI, Lucard was likely not fully forthcoming when he was interviewed by the FBI.[7]  For his participation in the January 6 attack, Lucard pleaded guilty, shortly after being charged by information, to parading, demonstrating, and picketing in a Capitol Building, in violation of 40 U.S.C. § 5401(e)(2)(G)—a lesser (Class B) misdemeanor than Mels' Class A misdemeanor—and this Court sentenced him to 21 days of intermittent confinement, as part of a sentence of 36-month probation.  Mels—who, in addition, sent text messages foretelling and glorifying political violence and who did not accept responsibility until shortly before trial—deserves a similar, but appropriately more severe, sentence.

This Court may also consider, as a lower bound, two cases in which the defendants, similarly to this case, (i) entered the Capitol with full knowledge of the violence required to breach the Capitol; and (ii) were among the first to breach a particular location.  *See, e.g.*, *United States v. Kerry Persick*, No. 1:21-cr-485 (BAH) (sentencing to 90 days of home confinement, as part of 36-month probation sentence, a January 6 defendant who (i) made a relatively early entry into the Capitol building (11 minutes after the initial breach); (ii) witnessed rioters entering through broken Senate wing windows; and (iii) spent approximately 18 minutes inside the Capitol);[8] *United States v. Jean Lavin*, No. 1:21-cr-596  (BAH) (sentencing to 10 days of intermittent confinement and 60 days of home confinement, as part of 36-month probation sentence, a January 6 defendant who (i)

---

[7]    Differently from Mels, Lucard entered and exited the Capitol building twice on January 6, including, in one instance, through a broken window.  While inside, Lucard also entered the office of Senator Merkley.

[8]    Differently from Mels, Persick reached a more sensitive area within the Capitol, which is an aggravating factor.  On the other hand, unlike Mels, Persick did not personally divert the officers' attention from their official duties.

entered the Capitol building after witnessing rioters directly in front of her shove law enforcement officers; (ii) made a relatively early entry into the Capitol building (11 minutes after the initial breach); and (iii) spent approximately 30 minutes inside the Capitol, where she witnessed additional confrontations between rioters and the police).  While *Persick* and *Lavin* are comparable to this case in some respects, a more severe sentence is warranted here.  Neither Persick nor Lavin appear to have made, before January 6, the type of violent, apocalyptic statements about the upcoming events that pervade Mels' pre-riot text messages.  Nor did Persick or Lavin wait until shortly before trial to accept responsibility for their conduct on January 6.  They both pleaded guilty relatively early on and were allowed to plead guilty to violating 40 U.S.C. § 5401(e)(2)(G)—a lesser (Class B) misdemeanor than Mels' Class A misdemeanor.  Taking these important differences into account, this Court should sentence Mels to 30 days of imprisonment, to be followed by supervised release.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id.* at 1095.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Mels to 30 days of imprisonment, one year of supervised release, 60 hours of community service, a $25 special assessment, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing a prison sentence as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

October 5, 2022                          Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  */s/ Francesco Valentini*
FRANCESCO VALENTINI
D.C. Bar No. 986769
Trial Attorney
United States Department of Justice, Criminal Division
Detailed to the D.C. United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov

By:  */s/ Douglas B. Brasher*
DOUGLAS B. BRASHER
Texas State Bar No. 24077601
Assistant United States Attorney (Detailed)
1100 Commerce Street, Third Floor
Dallas, TX 75242
(214) 659-8604
douglas.brasher@usdoj.gov