## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES ALLEN MELS,<br><br>     Defendant. | Crim. Action No. 1:21CR184(BAH) |

### MEMORANDUM IN AID OF SENTENCING

James Allen Mels will be before the Court for sentencing after having accepted responsibility for entering the Capitol building on January 6, 2021, when he knew it was restricted, in violation of 18 U.S.C.§ 1752(a)(1). Mr. Mels entered the Capitol through the Senate Wing doors after others had broken the doors. He did not personally engage in any violence or destruction of property, nor did he enter any sensitive areas. He was inside the building for approximately twelve minutes. The most extensive interaction he had with a police officer that day was a brief conversation in the hallway by the Senate Wing doors, during which he waved a small, paper copy of the Constitution. Mr. Mels exited the building as he entered— peacefully and through an open door. He did not bring any weapon of any kind to Washington, D.C.

Mr. Mels has acknowledged that prior to January 6, he sent private messages to a friend in which he spouted off about the election, politics, and what he then believed to be election fraud. The messages were intended to be private, and Mr. Mels never shared these sentiments publicly. Since his arrest and the prosecution of this

case, Mr. Mels has had time to reflect and talk with counsel about those messages. He understands that his exaggerated, inflammatory rhetoric could be viewed as dangerous, particularly when viewed in light of what transpired at the Capitol on January 6th. The language he used in those private messages does not reflect who Mr. Mels is or what his true intentions were that day.

Indeed, by all accounts, Mr. Mels is a gentle, respectful, industrious, family-oriented man. He is a proud veteran and has been employed as a metal model maker on factory floors for 30 years. For the past 27 years, he lived with his beloved wife, Dawn, in the same Detroit suburb in which he was raised. Tragically, six weeks after he pleaded guilty, on September 13, 2022, Dawn died suddenly after passing out at work. Mr. Mels took her to the hospital, believing she would undergo a routine checkup, only to be told hours later that she had passed away. Sadly, he did not get the chance to say goodbye. Mr. Mels is still in shock and grieving this profound loss. He is coping with the sudden death of his wife with the same resilience he has drawn upon at other difficult times in his life, by trying to pick up the pieces and move forward, one day at a time, with the help of his family and friends.

Mr. Mels has reviewed the Pre-Sentence Report (PSR) and offers no objection to the guideline range of 0 to 6 months. For the foregoing reasons, Mr. Mels, through counsel, respectfully submits that the Court should adopt Probation's recommendation and impose a sentence of 12 months of probation along with the restitution obligation. Such a sentence is sufficient but no greater than necessary to meet the goals of sentencing, as required by 18 U.S.C.§ 3553(a).

## I. Procedural History

On February 22, 2021, Mr. Mels was arrested at his job for his participation in the events on January 6, 2021. He was presented that day and released on conditions. Former Assistant Federal Public Defender, Cara Halverson, was appointed to represent Mr. Mels. On March 3, 2021, Mr. Mels was arraigned on an Information charging him with four misdemeanor offenses: Entering and remaining in a restricted building and disorderly and disruptive conduct in a restricted building, in violation of 18 U.S.C. §1752(a)(1) and (2), disorderly conduct in a Capitol building in violation of 40 U.S.C. §5104(e)(2)(D), and parading and picketing, in violation of 40 U.S.C. § 5104(e)(2)(G). Undersigned counsel noticed her appearance on March 29, 2022, after Ms. Halverson left the office. ECF. No. 35. On April 1, 2022, in response to a Minute Order, the parties jointly notified the Court that the plea offer had expired and proposed trial dates. ECF. No. 36. Ultimately, the Court set a trial date of August 1, 2022, and a pre-trial conference date of July 22, 2022. Due to the timing of undersigned counsel's entry on the case and Mr. Mels's inability to afford repeated trips to Washington, D.C., for in-person meetings with counsel, counsel met Mr. Mels for the first time when he drove to the District for his pre-trial conference. After having an opportunity to have all of his questions answered in person, Mr. Mels unequivocally decided that he wished to accept responsibility for his conduct. Mr.

Mels pleaded guilty that day to one count of entering and remaining in a restricted building, a class A misdemeanor.[1]

Following his change of plea hearing, Mr. Mels returned home to Michigan. As noted, shortly after he pleaded guilty, he suffered the sudden and devastating loss of his wife of 27 years. Nonetheless, he has fully cooperated with the preparation of a pre-sentence report.

**II. Legal Standard**

In determining a sentence, courts must impose the least amount of imprisonment necessary to accomplish the purposes set forth in § 3553. 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary . . ." (emphasis added)). The Sentencing Guidelines ("Guidelines") range is advisory, to be considered alongside the other factors that § 3553(a) enumerates. *See United States v. Booker*, 543 U.S. 220, 245 (2005).

III.   **The Sentencing Factors Applied to Mr. Mels Demonstrate that a Probationary Sentence is Sufficient but No Greater than Necessary to Achieve the Goals of Sentencing**.

i.     **Mr. Mels's history and characteristics support probation.**

---

[1] It is worth noting that the initial plea offer had been more lenient and would have permitted Mr. Mels to plead guilty to one count of parading and picketing, a petty offense. Counsel notes that the timing of Mr. Mels's plea should in no way undermine his wholehearted acceptance of responsibility. Rather, the timing reflects the challenges inherent to counsel representing multiple out-of-district defendants and the disruption caused by the inevitable transfer of cases from one attorney to another—factors over which Mr. Mels had no control.

James "Jimmy" Mels was born in Michigan in 1964. After graduating High School, he attended classes at Macomb Community College where he learned how to read blueprints to become a metal model maker. At 20, he joined the Army and was sent to the demilitarized zone in South Korea. Around the same time, he married his high school sweetheart, who encouraged Mr. Mels to leave the Army. Young when they married, the marriage did not last. The couple amicably divorced after three years with no children. PSR ¶ 48. In 1986, Mr. Mels was honorably discharged from the Army after having received a good conduct medal, an army service ribbon, army lapel button and an overseas service ribbon. PSR ¶ 60.

Following his divorce, Mr. Mels hit a rough a patch. Down on his luck and unemployed, he moved back in with his mother and father. He had just purchased a truck and was having trouble making payments on it. One day, a man in his area who appeared to be wealthy approached him and told him to open a bank account in Mr. Mels's name so that the wealthy man could move money through it. In exchange, the man agreed to help Mr. Mels make payments towards the truck. Mr. Mels agreed, and he laundered the man's money through his account on two occasions in exchange for money for his truck payments. He was convicted of bank fraud in 1994, and sentenced to three years of probation. PSR ¶ 38. His only brush with the criminal justice system was life altering: he distinctly remembers the judge telling him that he had to get a job or he would go to jail.

Mr. Mels took the judge's admonition to heart and has been gainfully employed as a metal model maker / machinist for the past 28 years. Importantly, prior to

5

January 6, Mr. Mels never again had any brushes with the law, and he was by all accounts a model citizen and hard worker. He is currently employed at RCO, where he worked between 2000 and 2009. In 2009, he left RCO to attempt to start his own business. When that was not as successful as he hoped, RCO hired him back in the same department. As an expert metal model maker and machinist, he cuts, shapes, and forms metal parts to create scale models of product blueprints. He earns $24 per hour, which works out to approximately $39,000 per year. PSR ¶ 62.

**Example of Mr. Mels's work**:

 

Ten years after his divorce from his high school sweetheart, Mr. Mels met his current wife, Dawn, on a blind date. For Mr. Mels, it was love at first sight. They married in 1994, shortly after their first date.  They were happily married for almost thirty years before Dawn suddenly passed away a few weeks ago.

**Jimmy and Dawn in 2021**



Dawn also worked at RCO Engineering as a housekeeper. RCO's director of human resources wrote the following of the Mels:

> Both Dawn and James have been exemplary employees in our organization. Both have good attendance records. They have proven themselves as steady workers who are respectful and pleasant while at work. They are both good at their jobs and have exhibited a high degree of dedication of the goals of our company.[2]

Together, Mr. Mels and Dawn took care of his aging parents. Mr. Mels's father is confined to a wheel chair after a severe stroke. In his letter to the Court, Mr. Mels's dear friend, Jon Carl, describes how Mr. Mels cares for his parents, taking his father out every Sunday. Mr. Mels's mother relies on him to help her with his father.[3]

Before Dawn died, the couple lived in a modest condominium, which they purchased in 2013. Mr. Mels currently owes $113,683 and pays approximately $985 per month on the mortgage. After all of their expenses, the couple had a little over $300 to spare each month. Without Dawn's modest income, it will be challenge for Mr. Mels to make ends meet.

---

[2] Letter of Cliff Weyhing, attached as part of Exhibit 1.
[3] Letter of John Carl, attached as part of Exhibit 1.

On September 12, 2022, Dawn passed out at work. Though she seemed fine immediately after, Mr. Mels took her to the hospital for what he thought would be a routine check. Shortly after she was admitted, a doctor called Mr. Mels to let him know that Dawn was put on a ventilator. Mr. Mels rushed to the hospital but she passed before he was able to see her.[4] Services were held one week following her passing.[5]

Mr. Mels is grieving and still in shock. He is leaning on his sister and friends for support. After taking one week off, he is back to work at RCO. As it always has, his work is grounding him and he is taking comfort in the routine and the companionship of his colleagues. Though counsel offered to seek a continuance of his sentencing hearing, Mr. Mels is eager to put this chapter behind him. As he explained to undersigned counsel, he feels that Dawn would have wanted him to go forward with the hearing, accept his sentence, and move on with his life.

ii.     **The nature and circumstances of Mr. Mel's offense support probation.**

Understanding the politically charged environment in Mr. Mels's community is important to understanding his mindset going into January 6, 2021. In the days and weeks leading up to January 6, Mr. Mels's community in Michigan had been inundated with stories—both online and on local radio stations—reporting that there

---

[4] The causes of death listed on the death certificate are septic shock, pneumonia, acute respiratory failure and hyponatremia.
[5] *See* Exhibit 2, obituary and pamphlet from Dawn Mels's funeral service.

had been widespread election fraud in Michigan carried out by the Biden campaign.[6] The former president himself falsely claimed voter fraud, tweeting missives such as, "In Detroit, there are FAR MORE VOTES THAN PEOPLE. Nothing can be done to cure the giant scam. I win Michigan!"[7] Mr. Mels, whom his good friend describes was "not very sophisticated," did not consume a variety of news sources, and he believed the stories he was seeing on his Facebook feed and on the local radio stations.[8] Mr. Mels was not alone in believing the claims of voter fraud he was seeing on his Facebook feed and hearing about in his community. After all, prominent figures were—and continue to—promoting the theory that the election was "stolen." Indeed, to this day, candidates running for national and statewide office are pedaling the

---

[6] For example, after a faulty initial vote tallies in Antrim County went viral Mr. Trump told Fox News that a judge had granted the Trump team access to conduct an audit the election results. Mr. Trump's personal lawyer, Rudy Giuliani, then sent a series of tweets such as "BIG WIN FOR HONEST ELECTIONS. Antrim County Judge in Michigan orders forensic examination of 22 Dominion voting machines. This is where the untrustworthy Dominion machine flipped 6000 votes from Trump to Biden. Spiking votes by Dominion happened all over the state." (@RudyGiuliani), *Twitter* (December 4, 2020, 7:12 PM), https://twitter.com/RudyGiuliani/status/1335014224532221952. *See* Mardi Link, *State Officials: Texas firm's report relies on false claims in Antrim County election lawsuit*, Record Eagle (Dec 14, 2020), https://www.record-eagle.com/news/local_news/state-officials-texas-firms-report-relies-on-false-claims-in-antrim-county-election-lawsuit/article_28b45918-3e2c-11eb-a281-8faf2b0daa1d.html. As noted in Mr. Carl's letter to the Court these and other false claims were widely discussed in Mr. Mels's community and shared on Facebook and local radio stations and popular podcasts.

[7] Jane C. Timm, *Fact check: Trump's bogus claim of more votes in Detroit than people*, NBC News (Nov. 18, 2020, 1:26 PM), https://www.nbcnews.com/politics/2020-election/fact-check-trump-s-bogus-claim-more-votes-detroit-people-n1248121.

[8] Letter of John Carl

story that Mr. Trump won the 2020 election to win votes and raise money.[9] In the days after the election, Mr. Mels consumed these reports of voter fraud in his own state with growing alarm. The stories the former president and others were spreading led him to believe that our democracy was threatened by Democrats who had been propagating voter fraud, just miles from his home. Stirred by these claims that his vote had been undermined by voter fraud, Mr. Mels sent a handful of private text messages to a friend using hyperbolic rhetoric to express how he was feeling. Notably, the language he used in these private messages mirrored the strong language Mr. Trump had broadcast to millions in his frequent Twitter explosions. Just by way of one example, while President, Mr. Trump tweeted that democrats are the "Enemy of the People," and "Do Nothing Democrats are wasting everyone's time and energy on BULLSHIT," and "WANT TO STEAL THE ELECTION."[10] At one rally, Mr. Trump referred to Democrats who did not applaud his State of the Union address as "treasonous."[11]  While there is no excuse, and Mr. Mels makes none for the tenor and

---

[9] Indeed, nearly half of all Republican current nominees in federal or state elections have questioned the legitimacy of the election, including in Michigan, where the GOP gubernatorial and attorney general candidate have denied the results of the 2020 election. Samuel Robinson, *These are the GOP election deniers on Michigan's ballot*, Axios (September 22, 2022), https://www.axios.com/local/detroit/2022/09/26/gop-election-deniers-on-michigans-ballot.

[10] Kevin Quealy, *The Complete List of Trump's Twitter Insults*, The New York Times (January 19, 2021), https://www.nytimes.com/interactive/2021/01/19/upshot/trump-complete-insult-list.html.

[11] Jacob Pramuk, *'Un-American' and 'treasonous': Trump goes after Democrats who didn't clap during the State of the Union*, CNBC (February 5, 2018, 4:11 PM), https://www.cnbc.com/2018/02/05/trump-calls-democrats-un-american-and-treasonous.html.

content of his private messages, this Court should consider that the extreme rhetoric Mr. Mels used in his private messages was not only implicitly condoned, but indeed *promoted*, by the man who once sat in the highest office in the country.

That aside, through frank conversations with counsel and friends, Mr. Mels has come to recognize how his language could be taken as dangerous and incendiary. Indeed, his friend Mr. Carl, who attended the pre-trial conference with him, describes how ashamed Mr. Mels was when he heard his messages read out loud in Mr. Carl's presence.[12] By all accounts, the language he used does not reflect what others who knew him well know to be his gentle and kind nature. Most importantly, it does not reflect what he actually did and intended to do on January 6, 2021, which is perhaps the strongest proof that he will not take action consistent with those texts in the future.

Invited to attend the "Stop the Steal" rally by the host of a popular podcast, Mr. Mels traveled to Washington, D.C. with a group from Michigan. The individuals in the group were brought together by the podcast host. Mr. Mels did not travel with any weapons. On January 6, after hearing the president speak at the rally, Mr. Mels walked towards the Capitol, as the president had exhorted the rally goers to do. After standing around outside and taking a few "selfie" photos, he entered the Capitol through the Senate Wing doors, shortly after others had breached the doors. Once inside the atrium, he briefly waved a small copy of the Constitution around while in

---

[12] Letter of John Carl ("his [Mr. Mels's] regret was evident in his entire demeanor.").

front of a police officer. He did not utter a single threatening word to any officer or anyone. Indeed, according to the report of the officer's interview, the officer does not remember what Mr. Mels said, suggesting that whatever he did say was not noteworthy. After waving the Constitution around, he wandered from the door to the Crypt and back out again. He did not enter any sensitive areas, vandalize any property, or touch anyone. He left approximately twelve minutes after he entered. That night, he slept in a firehouse with the group with whom he had traveled, and he returned home the next day.

After leaving the Capitol, Mr. Mels made no incendiary comments to anyone nor post on social media. Approximately 20 days later, agents came to his house to interview him. Contrary to the government's suggestion that he minimized his conduct, Mr. Mels admitted entering the Capitol and even opened up his phone and showed the agents the photos he took while inside. Having never been inside the Capitol before, he could not articulate where, *exactly*, he went in the building, but he willingly showed the agents pictures of where he went and tried to describe what he saw that day using the pictures on his phone.

Mr. Mels was arrested on February 11, 2021, without incident. He has been on conditions of pre-trial release since his arrest and has been compliant, which the exception of three instances in which he failed to report. After the Court reminded him of the importance of weekly reporting, Mr. Mels has not missed a single report since January 2022, even in the weeks following his wife's sudden death. PSR ¶ 11.

Mr. Mels has accepted responsibility for entering the Capitol and met with law enforcement after his plea. He has expressed his contrition in his letter to the Court and privately with friends and family. *See, e.g.*, Letter of Walter Kronner ("Jimmy has openly discussed with me his participation in the events on January 6 and has conveyed to me that he had no intention of doing anything destructive or harmful . . . but is extremely remorseful for being involved in the activities. . . "); Letter of Pastor Bruinsma ("every time he talks about [January 6], he has expressed great regret for breaking the law."): Letter of James Mels ("My actions were the opposite of patriotism").

At least one district judge has recognized that the false claims of a "stolen election" spread by prominent and trusted leaders can be a mitigating factor in some January 6 cases. In sentencing another veteran and misdemeanor defendant to probation for entering the Capitol, the Honorable Amit P. Mehta stated:

> It really does, in my mind, go to the power of propaganda; the power of being told lies over and over and over again; told by leaders who knew better, that something was taken away from the people when it wasn't. . . people were told over and over again something that was not true, so much so that people like [the defendant] lost his way."

*United States v. Cavanaugh*, 21CR362, Sentencing Tr. p. 29 (sentencing defendant, who was also a veteran, to 24 months' probation for entering the Capitol building). Undersigned counsel submits that Mr. Mels—a law-abiding, family-oriented, patriot and veteran—also lost his way after being inundated with stories of election fraud by prominent leaders, including the then-President and commander-in-chief. Mr. Mels has since acknowledged his wrongdoing and taken responsibility

for his conduct. The nature and circumstances of Mr. Mels's non-violent offense counsel in favor of a probationary sentence.

### iii.    A probationary sentence will meet the other goals of sentencing.

A probationary sentence will serve as a just punishment and adequate deterrent. Mr. Mels has already experienced serious consequences for his actions. The stress of facing incarceration and returning to Washington D.C. is enough to deter Mr. Mels. Mr. Mels is experiencing tremendous anxiety over the prospect of losing his job—literally his financial and emotional lifeline—which is more than sufficient to deter Mr. Mels from ever again breaking the law. He knows that his job would be further imperiled if he is forced to return to Washington, D.C. to answer for any potential probation violations. In order to come to his pre-trial conference, he drove all night with Mr. Carl so that they would not have to spend money on lodging and so that he would miss minimal amounts of work. He will do the same for his sentencing hearing. He simply cannot afford the cost of returning to D.C. for meetings with counsel or court dates, especially since his wife's death and the loss of additional income.[13]

It bears noting here that 30 days incarceration would be particularly punishing for someone in Mr. Mels's situation. Because Mr. Mels is an hourly wage-earner and could lose his job if he cannot attend his shifts, 30 days of incarceration would financially devastate him, particularly since he no longer has Dawn's income coming in. If he cannot make his mortgage payments, he will lose his home and his vehicle.

---

[13] Mr. Mels did not pay for his trip to D.C. for the Stop the Steal Rally.

The loss of much-needed wages, potential loss of employment, and certain financial ruin that a 30-day period of incarceration will cause are more draconian consequences than are warranted for Mr. Mels's non-violent misdemeanor offense.

With respect to general deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[14] In short, there is little empirical support for the prospect that a period of confinement will be any more effective at deterring Mr. Mels or others from committing this offense. And, indeed, the most effective deterrent is the certainty of punishment, not the severity

---

[14] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. of Rsch. in Crime and Delinq. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation.  Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

of punishment. *See, e.g., United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques").

Finally, the requested sentence will avoid unwanted disparities with other similarly situated January 6 defendants. *See United States v. Lollis*, 1:21CR671 (BAH) (imposing 36 months' probation with condition of home confinement on defendant who, like Mr. Mels, followed rioters through the Senate Wing doors, and who asked a police officer whether he was on the "same team" and then taunted the officer when he did not respond); *United States v. Torrens*, 1:21CR204 (BAH) (imposing 36 months' probation with condition of home confinement on defendant who entered through Senate Wing doors as others climbed through windows nearby, spent ten minutes inside the Capitol, including in various parts of the Crypt); *United States v. Amy Schubert*, 21-cr-588 (ABJ) (defendant sentenced to 18 months' probation where defendant entered congressional meeting room and took a "selfie"); *United States v. Anthony Mariotto*, 21-cr-094 (RBW) (defendant entered Senate Gallery and photographed himself inside, sentenced to 36 months' probation); *United States v. Joseph Zlab*, 21-cr-389 (RBW) (defendant who entered House Appropriations Room and was close to the House Chamber sentenced to 36 months' probation).

On this point, the government points to two cases—*United States v. Lucard* and *United States v. Lavin*—in which defendants received sentences of intermittent confinement.[15] The government's attempt to compare Mr. Mels's conduct to defendants Lucard and Lavin is misplaced. Defendant Lucard entered the Capitol building twice and took photos of Senator Merkley's ransacked personal office. All told, Lucard was inside the Capitol for 23 minutes.[16] Defendant Lavin spent approximately 32 minutes inside the building, and after witnessing violence against police officers on the West Front, shouted missives such as a "You fucking traitors!" towards police officers.[17] Mr. Mels did not enter any sensitive areas of the Capitol, he was inside for approximately ten minutes, and he did shout threats of any kind towards officers.

While no two cases have perfectly analogous facts, these cases show that that the sentence proposed by the defense and in the PSR report is not out of step with other January 6 cases in which defendants engaged in similar—if not more culpable conduct—than Mr. Mels.

**iv.    Application of the government's factors supports probation.**

In other January 6 cases, the government has identified nine relevant sentencing factors:

> While looking at the defendant's individual conduct, we must assess
> such conduct on a spectrum and with an eye towards its larger

---

[15] Gov. Sentencing Memo, ECF. No. 77 at 28.

[16] *United States v. Lucard*, 1:22CR87, Gov. Sentencing Memo, ECF. No. 21 at 2.

[17] *United States v. Lavin*, 1:21CR596, Gov. Sentencing Memo, ECF. No. 58 at 2.

consequences. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.[18]

Application of the government's factors show that probation is appropriate for Mr. Mels. As set forth herein and in the PSR, Mr. Mels peacefully traveled to Washington, D.C. to participate in a rally hosted by the President. He did not travel with an extremist or militant group or bring any weapons. He entered through doors that had already been broken. He did not engage in violence or destruction. He was inside for ten minutes and stayed only in areas traditionally open to the public. He cooperated fully with law enforcement. While his plea was somewhat delayed by his change in counsel due to staffing changes at the Federal Public Defender, he pleaded guilty without reservation. Finally, he has exhibited remorse and—in traveling to D.C. one month after the shocking death of his wife—he has shown that he is ready to accept the consequences of his actions.

---

[18] *See, e.g., United States v. Buckler*, 1:22CR162(TNM), ECF No. 26, Gov. Sentencing Memo at 26 (requesting 30 days of incarceration for defendant who entered the Capitol twice, the first time by climbing through a broken window and who entered a Senator's private office and was captured on video in the office while another individual smoked marijuana). Mr. Buckler was sentenced to probation with a condition of home incarceration.

Of course, the government's proposed factors are just suggestions. However, if the Court accepts the government's invitation to apply these factors, it is clear that these factors as well as the 3553 (a) factors support a sentence of probation for Mr. Mels.

## Conclusion

For the foregoing reasons, Mr. Mels respectfully requests that the Court impose the sentence recommended by U.S. Probation, that is, a sentence of 12 months' probation and restitution. Mr. Mels concurs with the PSR's determination that he does not have the ability to pay a fine in addition to restitution. PSR ¶ 69.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DFENDER

_____/s/_____
Elizabeth Mullin
Attorney to James Allen Mels
Assistant Federal Public Defender
Office of the Federal Public Defender
 for the District of Columbia
625 Indiana Avenue, N.W.
Washington, D.C. 20004